[S.F. No. 22896. In Bank. Oct. 4, 1973.]

JOHNNIE BRAXTON et al., Plaintiffs and Appellants, v.
THE MUNICIPAL COURT FOR THE SAN FRANCISCO JUDICIAL
DISTRICT OF THE CITY AND COUNTY OF SAN FRANCISCO,
Defendant and Respondent;
THE PEOPLE, Real Party in Interest and Respondent.

## COUNSEL

Ronald Yank, John Murcko, William Pinkus and Stuart Cutler for Plaintiffs and Appellants.

Paul N. Halvonik and Charles C. Marson as Amici Curiae on behalf of Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, W. Eric Collins, Robert R. Granucci and Sanford Svetcov, Deputy Attorneys General, for Defendant and Respondent and for Real Party in Interest and Respondent.

## OPINION

**TOBRINER, J.**—We consider here the constitutionality and proper construction of Penal Code section 626.4.[1] Section 626.4 authorizes the chief

---

[1]Penal Code section 626.4 (hereinafter section 626.4) provides: "(a) The chief administrative officer of a campus or other facility of a community college, state college, or state university, or an officer or employee designated by him to maintain order on such campus or facility, may notify a person that consent to remain on the campus or other facility under the control of the chief administrative officer has been withdrawn whenever there is reasonable cause to believe that such person has willfully disrupted the orderly operation of such campus or facility.

"(b) Whenever consent is withdrawn by any authorized officer or employee other

administrative officer of a state college or university, or a person designated by him, to issue an order summarily barring any person from a campus upon "reasonable cause to believe that such person has wilfully disrupted the orderly operation of such campus" (§ 626.4, subd. (a)). The statute also provides that a person who wilfully and knowingly enters or remains on campus following such an order commits a misdemeanor (§ 626.4, subd. (d)).

Asserting that section 626.4 on its face suffers from the defects of First Amendment overbreadth, unconstitutional vagueness, and the lack of

---

than the chief administrative officer, such officer or employee shall as soon as is reasonably possible submit a written report to the chief administrative officer. Such report shall contain all of the following:

"(1) The description of the person from whom consent was withdrawn, including, if available the person's name, address, and phone number.

"(2) A statement of the facts giving rise to the withdrawal of consent.

"If the chief administrative officer or, in his absence, a person designated by him for this purpose, upon reviewing the report, finds that there was reasonable cause to believe that such person has willfully disrupted the orderly operation of the campus or facility, he may enter written confirmation upon the report of the action taken by the officer or employee. If the chief administrative officer or, in his absence, the person designated by him, does not confirm the action of the officer or employee within 24 hours after the time that consent was withdrawn, the action of the officer or employee shall be deemed void and of no force or effect, except that any arrest made during such period shall not for this reason be deemed not to have been made for probable cause.

"(c) Consent shall be reinstated by the chief administrative officer whenever he has reason to believe that the presence of the person from whom consent was withdrawn will not constitute a substantial and material threat to the orderly operation of the campus or facility. In no case shall consent be withdrawn for longer than 14 days from the date upon which consent was initially withdrawn. The person from whom consent has been withdrawn may submit a written request for a hearing on the withdrawal within the two-week period. Such written request shall state the address to which notice of hearing is to be sent. The chief administrative officer shall grant such a hearing not later than seven days from the date of receipt of such request and shall immediately mail a written notice of the time, place, and date of such hearing to such person.

"(d) Any person who has been notified by the chief administrative officer of a campus or other facility of a community college, state college, or state university, or by an officer or employee designated by the chief administrative officer to maintain order on such campus or facility, that consent to remain on the campus or facility has been withdrawn pursuant to subdivision (a); who has not had such consent reinstated; and who willfully and knowingly enters or remains upon such campus or facility during the period for which consent has been withdrawn is guilty of a misdemeanor. This subdivision does not apply to any person who enters or remains on such campus or facility for the sole purpose . . . of attending a hearing on the withdrawal.

"(e) This section shall not affect the power of the duly constituted authorities of a community college, state college, or state university to suspend, dismiss, or expel any student or employee at such university or college."

Subdivision (f) sets forth penalties for violation of the statute.

procedural due process, petitioners (appellants here) sought a writ of prohibition to prevent their prosecution under the statute. Although a broad construction would infest section 626.4 with many of the asserted constitutional infirmities, we believe that a narrower interpretation will both effectuate the legislative purpose of the statute and confine it within constitutional parameters.

■　As we shall explain, the purpose of the legislation is to provide a swift remedy, by means of exclusion from the campus, of those students[2] who commit overt acts of violence or otherwise engage in illegal conduct which disrupts "the orderly operation of such campus." This remedy affords an alternative, supplementary, and often less onerous procedure than criminal prosecution. As the Select Committee on Campus Disturbances, which originated the enactment, stated, the statute places in the officers of state colleges and universities the "authority to protect educational institutions from individuals who have engaged in illegal campus disturbances and who return with the intention of illegally disrupting the campus."

■　We point out, however, that the statute, if literally applied, would succumb to constitutional attack both because of First Amendment overbreadth and vagueness. A literal construction of the terms of the statute—"willfully disrupted the orderly operation of [the] campus"—would violate constitutional mandates in that such vague language would include many forms of constitutionally protected expression and risk a chilling of free speech. Obviously the very sound of a voice can "disrupt" the silence, and the content of a speech can "disrupt" the equanimity of an audience.

■　To confine the statute within constitutional limits and to avoid the penalization of free speech, we interpret the words "willfully disrupted" to apply in a limited situation consistent with the legislative purpose. In authorizing temporary banishment, the Legislature, we believe, sought to draw a line between (1) physically disruptive conduct, otherwise proscribed by statute, which in an emergency situation "constitute[s] a substantial and material threat to the orderly operation of the campus" (§ 626.4, subd. (c)), and (2) the lawful exercise of free speech and other First Amendment liberties. We think the Legislature distinguished, in substance, between lawful peaceful persuasion and unlawful physical coercion.

We recognize, likewise, that the statute must be construed so as not to

---

[2]The record fails to disclose whether the petitioners were students. By its terms, however, section 626.4 applies to students and non-students alike. Since students normally possess rights not enjoyed by many non-students (use of the library, the right to attend classes), students constitute the group most likely to be burdened by the statute at issue. Accordingly, throughout this opinion reference is made to potential applications of the statute to students though the statute itself is not so confined.

violate the precepts of procedural due process; hence we interpret section 626.4 to require notice and a hearing on alleged misconduct before the issuance of any exclusion order unless the campus administrator reasonably finds that the situation is such an exigent one that the continued presence on the campus of the person from whom consent to remain is withdrawn constitutes a substantial and material threat of significant injury to persons or property. (§ 626.4, subd. (c).) Even when an exclusion order issues without a hearing, a post-exclusion hearing must be held as soon as reasonably possible not later than seven days following a request by the person excluded. Finally we hold that before any person can be convicted under section 626.4, the state must prove beyond a reasonable doubt not only that the person violated an exclusion order, but also that the order rested upon an actual disruption by unlawful conduct.

The nature of the legislation here construed can be understood only in light of the facts that gave rise to this case. This litigation emanates from student unrest at San Francisco State College in the fall of 1970. On November 16, petitioners allegedly demonstrated against the publication of articles, which they characterized as "racist and chauvinistic," that appeared in the campus newspaper. An employee of the college then informed petitioners that consent to remain on campus had been withdrawn "due to [their] previous wilful disruption of the order of the campus." Subsequently petitioners were arrested and charged with violating section 626.4 by wilfully entering and remaining upon the campus after receiving notice that consent to remain had been withdrawn. Thereafter the San Francisco Municipal Court overruled petitioners' demurrer challenging the constitutionality of section 626.4 on its face and the San Francisco Superior Court denied a writ of prohibition; from that denial petitioners appeal.

Because, as we have stated, a broad reading of section 626.4 yields constitutionally impermissible applications, petitioners urge that the statute be declared void on its face. In answer the Attorney General invokes the legislative history of section 626.4, arguing that a reasonable construction can bring the statute within constitutional limitations. ▪ In adopting the Attorney General's suggestion, we follow the well-settled principle that if " 'the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than another in conflict with the Constitution.' [Citations omitted.]" (*San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 948 [92 Cal.Rptr. 309, 479 P.2d 669].) We have in the past invoked this principle to render restrictive interpretations of enactments in order to uphold their constitutionality. (E.g., *In re Cox* (1970) 3 Cal.3d 205 [90 Cal.Rptr. 24, 474 P.2d 992]; *In re Kay*

(1970) 1 Cal.3d 930 [83 Cal.Rptr. 686, 464 P.2d 142]; *In re Bushman* (1970) 1 Cal.3d 767 [83 Cal.Rptr. 375, 463 P.2d 727]; *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375].)

We discuss, first, the broad constitutional principles that compel the interpretation we have set forth above.

I. ■ *The Doctrine of First Amendent overbreadth compels our interpretation of section 626.4 to exclude punishment for the content of speech, unless it constitutes an incitement to violence, or punishment for conduct entwined with speech, unless such conduct is physically incompatible with the peaceful functioning of the campus.*

Without a narrowing construction, section 626.4 would suffer First Amendment overbreadth. For example, reasoned appeals for a student strike to protest the escalation of a war, or the firing of the football coach, might "disrupt" the "orderly operation" of a campus; so, too, might calls for the dismissal of the college president or for a cafeteria boycott to protest employment policies or the use of non-union products. ■ Yet neither the "content" of speech nor freedom of association can be restricted merely because such expression or association disrupts the tranquility of a campus or offends the tastes of school administrators or the public. Protest may disrupt the placidity of the vacant mind just as a stone dropped in a still pool may disturb the tranquility of the surface waters, but the courts have never held that such "disruption" falls outside the boundaries of the First Amendment.

In the landmark case of *Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733], the United States Supreme Court upheld the right of even a high school student attending class to wear an armband as a silent witness of his opposition to the Vietnam War. The court specifically rejected the contention that such armbands might arouse the ire of pro-war students or divert attention from regular classroom activities; "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, . . ." (*Id.* at p. 508 [21 L.Ed.2d at p. 739].)

The *Tinker* court merely applied in the high school context a principle long recognized in constitutional adjudication. "[A] function of free speech under our system of government is to invite dispute. It may indeed best

serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." (*Terminiello* v. *Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 1134, 69 S.Ct. 894]; see also *Bachellar* v. *Maryland* (1970) 397 U.S. 564, 567 [25 L.Ed.2d 570, 573, 90 S.Ct. 1312]; *Gregory* v. *Chicago* (1969) 394 U.S. 111 [22 L.Ed.2d 134, 89 S.Ct. 946]; *Cox* v. *Louisiana* (1965) 379 U.S. 536, 552 [13 L.Ed.2d 471, 482, 85 S.Ct. 453]; *Edwards* v. *South Carolina* (1963) 372 U.S. 229, 237 [9 L.Ed.2d 697, 703, 83 S.Ct. 680].)

■ Controversial protest language or association with controversial groups may also "disrupt" a campus by offending the tastes of administrators, students, or the public; yet recent decisions of the United States Supreme Court dispel any notion that campus free speech or free association may be restricted merely because others find their exercise distasteful. In *Healy* v. *James* (1972) 408 U.S. 169 [33 L.Ed.2d 266, 92 S.Ct. 2338], the court upheld the right of local adherents of the Students for Democratic Society (SDS) to organize and enjoy the normal concomitants of university recognition even though many administrators and members of the public looked upon that organization with anathema.[3] And, only this term the court extended *Healy* in a decision reversing a student's expulsion for distributing an underground newspaper which carried a cartoon depicting policemen "raping" the "Statue of Liberty and Goddess of Liberty," and which displayed a headline containing an offensive word. As the Supreme Court explained, "We think *Healy* makes it clear that the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" (*Papish* v. *University of Missouri Curators* (1973) 410 U.S. 667, 670 [35 L.Ed.2d 618, 622, 93 S.Ct. 1197, 1199] (italics added); cf. *Cohen* v. *California* (1971) 403 U.S. 15 [29 L.Ed.2d 284, 91 S.Ct. 1780] (conviction reversed in a case in which a student in a courthouse wore a jacket inscribed with an offensive slogan).)[4]

---

[3]The lower federal courts have applied this principle in a variety of situations. (E.g., *Joyner* v. *Whiting* (4th Cir. 1973) 477 F.2d 456 (upholding the right of black students to advocate in the campus newspaper the exclusion of whites from the campus even though such advocacy was "annoying" to many members of the public and "disruptive" of the serenity of the academic community); *National Socialist White People's Party* v. *Ringers* (4th Cir. 1973) 473 F.2d 1010 (school board could not deny use of a public auditorium, repeatedly rented to other groups, to a group with racially exclusive membership); *Garvin* v. *Rosenau* (6th Cir. 1972) 455 F.2d 233 (complaint that a principal denied recognition to the Student Mobilization Committee raised a substantial federal question).)

[4]These recent decisions of the United States Supreme Court upholding the constitutional right of college students to use controversial language in public protest cast considerable doubt on the continued vitality of *Goldberg* v. *Regents of the*

■ Of course, not every expression finds protection in the First Amendment. Incitement to violence or unlawful acts (*Sellers* v. *Regents of University of California* (9th Cir. 1970) 432 F.2d 493) and "fighting words" (*Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568 [86 L.Ed. 1031, 62 S.Ct. 766]) were long ago held beyond the embrace of the amendment. (See also, *In re Bozorg* (1973) 9 Cal.3d 612 [108 Cal.Rptr. 465, 510 P.2d 1017].) The incited violence, however, must be a specifically intended consequence of the speaker's plea and not a result of unreasonable reactions by hostile onlookers or overly zealous supporters. (*Cohen* v. *California, supra,* 403 U.S. at p. 20 [29 L.Ed.2d at p. 291].) If some members of an audience create the disruption, they and not the speaker or other members of the audience are liable for punishment (*Cassidy* v. *Ceci* (E.D.Wis. 1970) 320 F.Supp. 223, 226-227.)

Without a narrowing construction, section 626.4 would also suffer overbreadth by unnecessarily restricting conduct enmeshed with First Amendment activities. Although conduct entwined with speech may be regulated if it is completely incompatible with the peaceful functioning of the campus, section 626.4 on its face fails to distinguish between protected activity such as peaceful picketing or assembly and unprotected conduct that is violent, physically obstructive or otherwise coercive.

"[A]ll speech is necessarily 'speech plus.' If it is oral, it is noise and may interrupt someone else; if it is written it may be litter."[5] Accordingly, the Supreme Court has recognized that "[j]ust as in the community at large, reasonable regulations with respect to the time, the place, and the manner in which student groups conduct their speech related activities must be respected." (*Healy* v. *James, supra,* 408 U.S. at pp. 192-193 [33 L.Ed.2d at p. 286]; cf. *United States* v. *O'Brien* (1968) 391 U.S. 367 [20 L.Ed.2d 672, 88 S.Ct. 1673]; *Kovacs* v. *Cooper* (1949) 336 U.S. 77 [93 L.Ed. 513, 69 S.Ct. 448, 10 A.L.R.2d 608]; *In re Kay* (1970) 1 Cal.3d 930 [83 Cal. Rptr. 686, 464 P.2d 142].) "The crucial question is whether the manner of expression is basically *incompatible* with the normal activity of a particular place at a particular time." (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 116 [33 L.Ed.2d 222, 232, 92 S.Ct. 2294].) (Italics added.)

*University of California* (1967) 248 Cal.App.2d 867 [57 Cal.Rptr. 463] (upholding suspensions and dismissal of students involved in a protest defending the public use of an opprobrious word after a student was suspended for carrying a sign with that word) insofar as that decision rested upon the offensiveness of the speech involved. (Cf. *Lindros* v. *Governing Bd. of the Torrance Unified School Dist.* (1973) 9 Cal.3d 524 [108 Cal.Rptr. 185, 510 P.2d 361].)

[5]Kalven, *The Concept of the Public Forum: Cox* v. *Louisiana,* 1965 Sup. Ct. Rev. 1, 23.

Clearly acts of violence, although committed in the name of causes considered righteous by their perpetrators, are "incompatible" with the time-honored role of universities as centers for free intellectual debate; such acts of coercion fall outside the safeguarding sphere of the First Amendment. Thus the physical intimidation of students, faculty, or staff,[6] obstruction of ingress or egress,[7] and physical intrusion upon or destruction of property[8] can be punished. On the other hand peaceful activity such as leafletting[9] and canvassing[10] enjoy broad protection under the First Amendment; those forms of "speech-conduct" are rarely "incompatible" with classes, research, or the administrative functions of an educational institution.

In addition, the regulation of the loud and disturbing noises that often erupt from campus demonstrations can be sustained only upon a careful balancing of competing interests; yet on its face section 626.4 purports to reach *any* noise that "disrupt[s] the orderly operation of the campus," and thus, again, without a narrowing construction, would suffer First Amendment overbreadth. "Noisy demonstrations that disrupt or are incompatible with normal school activities are obviously within the . . . reach [of permissible state regulation]. Such expressive conduct may be constitutionally protected at other places or other times [citations], but next to a school [building], while classes are in session, it may be prohibited." (*Grayned* v. *City of Rockford, supra,* 408 U.S. at p. 120 [33 L.Ed.2d at p. 234].) ■ Clearly, for example, the use of noise amplification devices, such as bullhorns and loudspeakers, can be sharply curtailed on the campus if such regulation is necessary to prevent substantial interference with the work of captive audiences in classrooms and research facilities. (Cf. *Kovacs* v. *Cooper, supra,* 336 U.S. 77.)

[6]*People* v. *Arvanites* (1971) 17 Cal.App.3d 1052 [95 Cal.Rptr. 493] (student demonstrators, protesting discharge of cafeteria worker, crowded into university administrator's office, barricaded doors, and prevented him from leaving for several hours).

[7]E.g., *Rozman* v. *Elliott* (8th Cir. 1972) 467 F.2d 1145 (ROTC building occupied by demonstrators preventing normal classes); *Dougherty* v. *Walker* (W.D.Mo. 1972) 349 F.Supp. 629 (protesting professor, inter alia, laid down in path of marching band); cf. *Cameron* v. *Johnson* (1968) 390 U.S. 611, 616 [20 L.Ed.2d 182, 187, 88 S.Ct. 1335].

[8]E.g., *Lowery* v. *Adams* (W.D.Ky. 1972) 344 F.Supp. 446 (students forced entry into restricted portion of building).

[9]*Jones* v. *Board of Regents of University of Arizona* (9th Cir. 1970) 436 F.2d 618; *Jacobs* v. *Board of School Com'rs of City of Indianapolis* (S.D.Ind. 1972) 349 F.Supp. 605.

[10]*James* v. *Nelson* (N.D.Ill. 1972) 349 F.Supp. 1061 (right to carry on political canvassing in college dormitories upheld even though alternative forums existed because canvassing in residence halls was a traditional method of political activity).

In *In re Bozorg, supra,* 9 Cal.3d 612, we recognized, however, that a statute which purported to reach every disturbance of other persons by loud noises would have been constitutionally infirm. "When the word 'noise' in the statute is properly construed consistent with the First Amendment and traditional views, it encompasses communication made in a loud manner only when there is a clear and present danger of violence or when the communication is not intended as such but is merely a guise to disturb persons." *(Id.* at p. 619.)

We conclude that these cases establish certain basic principles. ▉ Speechmaking may be curtailed in a defined area that is specifically and narrowly described—such as classrooms, libraries, faculty and administration offices, and corridors adjoining those facilities—where the resulting noise is incompatible with the essential functioning of the campus, and so long as other places on the campus provide reasonable alternative forums for the proselytization of dissident views. The use of devices for noise amplification can be reasonably regulated to prevent disruption incompatible with the functioning of the institution. ▉ And where communication merely serves as a guise for noisy disruption, it may be regulated. We construe the instant statute in accordance with these principles.

▉ In order to avoid the constitutional overbreadth that a literal construction of section 626.4 would entail, we interpret the statute to prohibit only incitement to violence or conduct physically incompatible with the peaceful functioning of the campus. We agree with the Attorney General in his statement: "[T]he word 'disrupt' is commonly understood to mean a *physical* or *forcible* interference, interruption, or obstruction. In the campus context, disrupt means a physical or forcible interference with normal college activities."

The disruption must also constitute "a substantial and material threat" to the orderly operation of the campus or facility. *(Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503, 514 [21 L.Ed.2d 731, 742, 89 S.Ct. 733].) The words "substantial and material" appear in the portion of the statute which authorizes reinstatement of permission to come onto the campus. (Pen. Code, § 626.4, subd. (c).) Accordingly we read those words as expressing the Legislature's intent as to the whole function of the statute; we thus construe section 626.4 to permit exclusion from the campus only of one whose conduct or words are such as to constitute, or incite to, a substantial and material physical disruption incompatible with the peaceful functioning of the academic institution and of those upon its campus. Such a substantial and material disruption creates an emergency situation justifying the statute's provision for summary, but temporary, exclusion.

Our holding thus accords with the constitutional principles we have set forth above: the statute does not restrict speech upon the ground that such expression might disturb the tranquility of the campus or offend the tastes of school administrators or the public, nor does it reach speech-conduct unless it involves acts physically incompatible with the peaceful functioning of the campus. The Legislature did not intend any sweeping penalization of speech; it meant to condemn unlawful disruptive, coercive conduct, not free expression.

II. *In order to overcome the vice of vagueness, we construe section 626.4, consistent with its legislative purpose, to authorize summary banishment from campus only when the person excluded has committed acts proscribed by other statutes.*

Contending that section 626.4 suffers unconstitutional vagueness,[11] petitioners invoke recent language of the United States Supreme Court. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know *what* is prohibited, so that he may act accordingly. . . . Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit *standards* for those who apply them. . . . Third, . . . where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms' . . . [u]ncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone.' . . . than if the boundaries of the forbidden areas were clearly marked." (*Grayned* v. *City of Rockford, supra,* 408 U.S. at pp. 108-109, fns. omitted [33 L.Ed.2d at pp. 227-228] (italics added).)

Petitioners point out that even though the test of substantial and material physical disruption by acts or incitement of violence constitutes an acceptable constitutional standard for preventing overbroad applications of the statute in specific cases, the enactment still fails to provide the precision normally required in criminal legislation. Thus, for example, persons subject to summary banishment must guess at *what* must be disrupted (i.e., classes or the attendance lines for athletic events), and *how* the disruption must take place (by picketing or by a single zealous shout in a classroom or by a sustained sit-in barring use of a classroom for several days).

---

[11]See generally Amsterdam, *The Void for Vagueness Doctrine in the Supreme Court* (1960) 109 U.Pa.L.Rev. 67.

Our examination of the legislative history and purposes of section 626.4 reveals, however, that the Legislature intended to authorize the extraordinary remedy of summary banishment only when the person excluded has committed acts illegal under other statutes; since these statutes provide ascertainable standards for persons seeking to avoid the embrace of section 626.4, the instant enactment is not void for vagueness. In support of this analysis, we turn to a review of the origins of the statute.

During the 1960's the citizenry was understandably shaken by the wave of disorders, often violent, which swept across 76 percent of the major American colleges examined in one United States Department of Justice study.[12] In May 1969, the Legislature's Select Committee on Campus Disturbances reported that California "institutions of higher education . . . are in a state of crisis [due to] overt acts of violence, walk-outs, sit-ins, strikes and physical intimidation of students, faculty, and administrators."[13] The Legislature itself declared that "serious disruptions have occurred . . . that such disruptions threaten the peaceful pursuit of higher education, and that they are a matter of statewide concern."[14] In this turbulent atmosphere of student disorder and deepening public reaction the Legislature enacted section 626.4; the statute was designed to apply to emergencies occasioned by the widespread physical disruption which often accompanied the protests of the 1960's.

The Select Committee noted that their proposals sought to provide campus officials with "clear authority to protect educational institutions from individuals who have engaged in *illegal* campus disturbances and who return with the intention of *illegally* disrupting the campus." (Select Committee on Campus Disturbances, *Report* (1969) Assem. J. Appendix (1969 Reg. Sess.) p. 2.) (Italics added.) Thus the Select Committee proposed that administrators struggling to quell campus disorders be given the option of temporarily excluding from the campus persons committing unlawful acts. As the Attorney General points out, the committee thought that temporary exclusion would afford a lesser, but in some circumstances more effective, sanction than exclusive reliance on eventual criminal prosecution for specific illegal acts. The committee carefully noted the necessity to

[12]United States Department of Justice, Report of Community Relations Service Student Unrest Survey 1 (Sept. 1969). For further documentation of the rise of student protest, see Report of the President's Commission on Campus Unrest (1970) and the Report of the American Bar Association Commission on Campus Government and Student Dissent (1970).

[13]Select Committee on Campus Disturbances (hereinafter Select Committee) *Report* (1969) Assem. J. Appendix (1969 Reg. Sess.) p. 1.

[14]Statutes of 1969, chapter 1427, section 6, page 2932.

"distinguish between: (a) lawful forms of dissent, and protest protected under the Constitution, and (b) unlawful activities involving the use of violence or the threat of violence to force concessions from properly constituted authority." (*Id.*)

As originally introduced in the Legislature, the statute required a specific intent and an unlawful act as a basis for an exclusion order — i.e., an "unlawful act *for the purpose* of disrupting." (Italics added.) The statute was amended to its present form ("willfully disrupted") on the Senate floor. (Sen. J. (1969) pp. 4407-4409.) Petitioners argue that by this amendment the Legislature intended to broaden the statute to reach lawful, and constitutionally protected, protest.

We agree, however, with the suggestion of the Attorney General: "[T]he above-described amendment is, on its face, no more than a substitution of a general intent provision—'willfully disrupted'—for the initial specific intent proposed." █ In light of the Select Committee's report, and in the absence of any other indication that the Legislature intended to broaden the statute to reach otherwise lawful activity, we hold that section 626.4 requires reasonable cause to believe the person excluded has incited or engaged in conduct causing a substantial and material physical disruption of an educational institution by the commission of unlawful acts.

In adopting this construction of section 626.4 we note, as did the Select Committee in its report to the Legislature, that other criminal statutes reach virtually every conceivable form of illegitimate campus disruption. Thus, for example, assault (Pen. Code, § 240), battery (Pen. Code, § 242), physical obstruction of ingress or egress (Pen. Code, § 602, subd. (j); Pen. Code, § 602, subd. (k); Pen. Code, § 602, subd. (l); Pen. Code, § 647c), refusal to leave a public building upon request after its regular closing (Pen. Code, § 602, subd. (n)), destruction of property, incitement or participation in a riot (Pen. Code, §§ 404-405), remaining at the scene of a riot after a lawful warning to disperse (Pen. Code, § 409), resisting a police officer (Pen. Code, §§ 148, 405a) and numerous other specific acts[15] all constitute separate crimes under the Penal Code. The 1969 Legislature passed additional statutes proscribing other specific acts on

---

[15]Other criminal statutes proscribe more violent acts: i.e., possessing a firearm and ammunition on campus (Pen. Code, §§ 171c and 171e), concealment or malicious possession of explosives (Pen. Code, § 12020), arson or attempted arson (Pen. Code, § 448a; § 449a; § 451a), and possession of an incendiary or firebomb (Pen. Code, § 452).

Of course we do not pass on the constitutionality of any of these other enactments either on their face or as they may be applied.

college campuses, including, inter alia, noise disruptions (Pen. Code, § 415.5) and the physical intimidation of students and professors seeking to attend classes (Pen. Code, § 602.10). ■ In enacting section 626.4 the Legislature sought to provide campus authorities with a new remedy—temporary exclusion—to supplement arrest as a means of dealing with protestors who disrupt by acts illegal under these and other statutes.

■ Finally, to bring the statute within the requirements of procedural due process, we again accept the Attorney General's suggestion and hold that section 626.4 authorizes a summary exclusion order, without a prior hearing, only when necessary to prevent significant injury to persons or property during an emergency occasioned by a campus disorder. As we have seen, section 626.4 was designed to allow administrators to deal effectively with such emergency conditions. Although procedural due process normally requires a pre-exclusion hearing to allow the accused wrong-doer an opportunity to contest the charges or explain his actions, section 626.4 authorizes the administrator to act summarily in the event of emergency. A hearing must be afforded, however, as soon as reasonably possible, and, in no event, can it be delayed beyond seven days of a request for a hearing by the persons excluded. (§ 626.4, subd. (c).)[16]

■ Finally, as the Attorney General concedes, to sustain a conviction

---

[16]Although once regarded as a mere privilege, courts have for more than a decade held that procedural due process requires appropriate notice and hearing before the right to attend a state university or college is withdrawn. (*Dixon* v. *Alabama State Board of Education* (5th Cir. 1961) 294 F.2d 150, cert. den. 368 U.S. 930 [7 L.Ed.2d 193, 82 S.Ct. 368] (expulsion of student editor).) Due process requires, at least, a pre-exclusion hearing with the rights to confrontation, presentation of evidence, and inspection of any findings. (*Dixon* v. *Alabama State Board of Education*, *supra*, 294 F.2d at pp. 158-159; *Perlman* v. *Shasta Joint Jr. College Dist. Bd. of Trustees* (1970) 9 Cal.App.3d 873 [88 Cal.Rptr. 563].) Due process always requires, of course, that substantial evidence support sanctions imposed for alleged misconduct (e.g., *Wong* v. *Hayakawa* (9th Cir. 1972) 464 F.2d 1282 (reversing college disciplinary actions against students based solely on police records of *arrests* for unlawful assembly, refusal to disperse, and disturbing the peace). Suspensions as well as expulsions require fair notice and a pre-exclusion hearing. (*Stricklin* v. *Regents of University of Wisconsin* (W.D.Wis. 1969) 297 F.Supp. 416 (summary suspension for 13 days); *Black Students, etc.* ex rel. *Shoemaker* v. *Williams* (M.D.Fla. 1970) 317 F.Supp. 1211, revd. on other grounds (5th Cir. 1971) 443 F.2d 1350 (suspension for 10 days); *Perlman* v. *Shasta Joint Jr. College Dist. Bd. of Trustees, supra*, 9 Cal.App.3d 873.) Both courts (*Williams* v. *Dade County School Board* (5th Cir. 1971) 441 F.2d 299, 301; *Gardenhire* v. *Chalmers* (D.Kan. 1971) 326 F.Supp. 1200 1205) and commentators (Wright, *The Constitution on the Campus* (1969) 22 Vand.L.Rev. 1027, 1074; Buss, *Procedural Due Process for School Discipline: Probing the Constitutional Outline* (1971) 119 U.Pa.L.Rev. 545, 577-579) agree, however, that an exception to the requirement for a pre-exclusion hearing arises during an emergency occasioned by campus disorder threatening significant injury to persons or property.

under section 626.4 the prosecution must prove beyond a reasonable doubt both: (1) that the person excluded did cause a disruption, as herein defined, by illegal acts, and (2) that he violated the exclusion order. Any other construction would subject a defendant to criminal sanctions upon proof that he violated a section 626.4 exclusion order even though later evidence revealed that, despite the fact that reasonable cause supported the order at the time of its issuance, the accused had not actually engaged in any illegal and disruptive conduct.

In conclusion, we quote these salient words: "What is happening to our young people? They disrespect their elders, they disobey their parents. They ignore the laws. They riot in the streets inflamed with wild notions. Their morals are decaying."[17] Voiced by Plato some 2,300 years ago, these words remind us that youthful rebellion is not peculiar to recent years. Assuredly the 1960's marked the decade when many groups in our culture demanded new recognition and greater opportunity to affect public policy; none were more vocal than university students. Their pleas and protests did indeed win adjustments both on campus and in government itself. To the extent that the protestors appealed to reason and relied on peaceful persuasion they deserved full constitutional protection. When, however, they crossed the line to become coercive and unlawful, they necessarily lost that protection. The legislative dictate in section 626.4 that a student who engages in such conduct temporarily foregoes his right to remain on campus, a deprivation hedged with appropriate limiting procedures, does not constitute an unconstitutional incursion.

The order of the superior court denying a writ of prohibition is affirmed.

Wright, C. J., McComb, J., Mosk, J., and Burke, J., concurred.

---

[17]Plato, The Laws I (cited in Herman, *Injunctive Control of Disruptive Student Demonstrations* (1970) 56 Va.L.Rev. 215).