[No. C036977. Third Dist. June 10, 2003.]

MARTHA REEVES et al., Plaintiffs and Appellants, v.
ROCKLIN UNIFIED SCHOOL DISTRICT et al., Defendants and
Respondents.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

654

**COUNSEL**

David L. Llewellyn, Jr., for Plaintiffs and Appellants.

Duncan, Ball & Evans, Mathew D. Evans, Bridget C. Halvorson, Georgann Johnston and James B. Carr for Defendants and Respondents.

**OPINION**

**HULL, J.**—In this matter we decide whether members of the Sanctity of Human Life Network (SOHLNET) have the right to come onto the campus of Rocklin High School to distribute anti-abortion, proabstinence literature to students before class. Because a high school is not a college campus or public forum, we conclude that the school administration may constitutionally limit access by outsiders, regardless of their message or purpose, in order to prevent disruption.

Plaintiffs Martha Reeves, Harry Reeves, John Ficker, and Murray Lewis are members of SOHLNET who sought to distribute anti-abortion and

proabstinence literature on the grounds of Rocklin High School as students arrived in the morning. The principal of the high school refused to let them do so. Instead, SOHLNET distributed its pamphlets on nearby public streets.

Plaintiffs then filed a complaint seeking injunctive and declaratory relief against the Rocklin Unified School District (RUSD), asserting that the school's regulations concerning access to the high school campus violated their constitutional rights. After a bench trial, the court upheld the validity of the regulations and entered judgment in favor of defendants.

Plaintiffs appeal. We affirm.

### FACTS AND PROCEDURAL HISTORY

Approximately 15 members of SOHLNET, including plaintiffs, planned to distribute anti-abortion literature to Rocklin High School students on May 26, 1998. At 7:00 a.m. that morning, the group met with their attorney, Dana Cody, in a nearby shopping center parking lot to plan their strategy. They decided that plaintiffs would distribute leaflets and talk to students at two on-campus locations, the student parking lot and the bus drop-off point, while others distributed literature on a nearby street. The group planned to leave the high school at 7:45 when the first bell rang for class.

Attorney Cody advised the group that state law required them to register in order to be on campus. At approximately 7:15 a.m., as the SOHLNET group arrived at the high school, plaintiff Murray Lewis and Cody went to the school office to register.

They spoke briefly to the assistant principal, Steven James, and told him they were there to "leaflet" on campus. James looked briefly at their leaflet, and said that any permission to register would have to come from the principal, Phillip Spears. The administrators were aware SOHLNET had attempted to gain access to the campus the year before. At that time, the group had videotaped students and tried to pass out literature, and the police had to be summoned.

Principal Spears told Cody and plaintiff Lewis that they did not have legitimate business on campus and would not be allowed to register. Spears was concerned about potential disruption of the school's normal routine and possible safety problems associated with having unsupervised outsiders mingling with students. He told them to leave the campus, and a police officer working at the school directed the group to the public street.

By 7:30 a.m., plaintiffs and the other SOHLNET members had stationed themselves on Stanford Ranch Road. They carried large anti-abortion placards, and handed out literature to drivers and students. Traffic was backed up

nearly two miles. One SOHLNET member repeatedly pushed the pedestrian signal in order to stop cars. Another stood on a median until directed to the sidewalk by a police officer. Another member, carrying a large poster, obstructed the sidewalk, requiring students to walk in the street to avoid being confronted with the leaflets. A police officer diverted a group of students who appeared to be intent on confronting SOHLNET members. Many students were late to class.

Thereafter, Cody wrote to the school superintendent to ask for a hearing and to seek permission for future access. The superintendent met with Cody on June 1 and discussed the matter. Cody did not receive any formal communication resolving the question of access to the campus nor did she pursue the matter with the school board.

Instead, plaintiffs filed a complaint, asserting that the school's refusal to allow them to register and to have access to the campus violated the constitutional rights of SOHLNET's members. After a bench trial, the court entered judgment in favor of defendants. The court determined that school officials acted reasonably in refusing access to plaintiffs, noting: "Common [sense] dictates that the purpose of our high schools is to educate our youth in a safe environment under the direction of trained professionals preparing them for adult life in the work force or continued college education. It is hard to imagine how this purpose can be advanced by a barrage of special interest groups using the high school campus to advance their own viewpoint as noble as the cause may be. Surely, equal time must be granted for opposing viewpoints." The court added that administrators had "a reasonable basis to believe the visitors['] presence would be disruptive," and rejected plaintiffs' claim that only conduct that was physically disruptive and unlawful under other statutes could be deemed "disruptive." The court also rejected plaintiffs' claims that the school's registration policies and procedures were otherwise unconstitutional or deficient.

This appeal followed.

DISCUSSION

I

*Statutory Scheme and Rocklin Unified School District Policies*

In order to place plaintiffs' claims in the proper context, we review the relevant statutory scheme and the policies of the RUSD.

In 1982, the California Legislature enacted chapter 1.1 of title 15 of part I of the Penal Code, a comprehensive scheme relating to access to school

premises. (Stats. 1982, ch. 76, § 1, p. 228.) The Legislature decried the fact that violent crimes on public school grounds are often committed by outsiders unauthorized to be on the premises (Pen. Code, § 627, subds. (a)(1), (2), (c) [further undesignated statutory references are to the Penal Code]), and further stated that "[s]chool officials and law enforcement officers, in seeking to control these persons, have been hindered by the lack of effective legislation restricting the access of unauthorized persons to school grounds and providing appropriate criminal sanctions for unauthorized entry" (§ 627, subd. (a)(3)).

The Legislature declared that this new statutory scheme was intended to "safeguard the teachers, other employees, students, and property of public schools." (§ 627, subd. (b).) This provision continues: "The Legislature recognizes the right to visit school grounds for legitimate nonviolent purposes and does not intend by this enactment to interfere with the exercise of that right."

Section 627, subdivision (c) further provides, in relevant part: "It is the intent of the Legislature in enacting this chapter to promote the safety and security of the public schools by restricting and conditioning the access of unauthorized persons to school campuses and to thereby implement the provisions of Section 28 of Article 1 of the California Constitution which guarantee all students and staff the inalienable constitutional right to attend safe, secure, and peaceful public schools. It is also the intent of the Legislature that the provisions of this chapter shall not be construed to infringe upon the legitimate exercise of constitutionally protected rights of freedom of speech and expression which may be expressed through rallies, demonstrations, and other forms of expression which may be appropriately engaged in by students and nonstudents in a campus setting."

To meet these safety concerns, section 627.2 provides: "No outsider shall enter or remain on school grounds during school hours without having registered with the principal or designee, except to proceed expeditiously to the office of the principal or designee for the purpose of registering." An "outsider" is defined as anyone other than a student, parent or guardian of a student, a school district employee or officer, a public employee required to be on school grounds, anyone on school grounds at the request of the school, a representative of a school employee organization engaged in representational activities, an elected public official, or certain media personnel. (§ 627.1, subd. (a).) " 'School hours' extend from one hour before classes begin until one hour after classes end." (§ 627.1, subd. (c).)

Section 627.4, subdivision (a), a statute of particular importance in this case, provides: "The principal or his or her designee may refuse to register

an outsider if he or she has a reasonable basis for concluding that the outsider's presence or acts would disrupt the school, its students, its teachers, or its employees; would result in damage to property; or would result in the distribution or use of unlawful or controlled substances." Subdivision (b) of this statute further provides: "The principal, his or her designee, or school security officer may revoke an outsider's registration if he or she has a reasonable basis for concluding that the outsider's presence on school grounds would interfere or is interfering with the peaceful conduct of the activities of the school, or would disrupt or is disrupting the school, its students, its teachers or its other employees."

It is a misdemeanor for a person to enter or remain on school grounds without having registered, after having been denied registration, or after registration has been revoked. (§ 627.7, subd. (a).) However, these criminal provisions "shall not be utilized to impinge upon the lawful exercise of constitutionally protected rights of freedom of speech or assembly." (§ 627.7, subd. (b).)

·A person whose registration was denied or revoked may request a hearing before the principal or superintendent. This request must be made within five days, and the hearing must be held within seven days of receipt of the request. (§ 627.5.)

This statutory scheme thus has two areas of focus: student safety and the protection against disruptions. Other statutes afford similar safeguards. For example, Education Code section 32211 authorizes a principal to request that an outsider (that is, someone who is not a student, parent of students, employee or officer of the district) leave public school grounds if that person's continued presence "would be disruptive of, or would interfere with, classes or other activities of the public school program." (Ed. Code, § 32211, subd. (a).) Section 626.7 similarly provides for the removal of an outsider who "is committing any act likely to interfere with the peaceful conduct of the activities of the campus or facility."

RUSD adopted "Board Policy 7007" and "Administrative Procedure 7007" to address the same safety and operational concerns. Board Policy 7007 "encourages parents/guardians and interested members of the community to visit the schools and view the educational program" and directs the superintendent to establish procedures to facilitate visits. The policy further directs: "To ensure the safety of students and staff and avoid potential disruptions, all visitors shall register immediately upon entering any school building or grounds when school is in session."

Administrative Procedure 7007 outlines the mechanisms to meet these policy objectives. It provides: "Each person (excludes currently enrolled

students, employees of the school District, or other individuals performing services as per agreements with authorized District representatives) desiring to visit a school during school hours must secure permission upon arriving on the campus from the school principal/designee for the visitation." High school hours extend from 7:00 a.m. to 3:30 p.m.

This administrative procedure further provides that "Any person other than the following is considered a visitor and required to register upon entering school premises during school hours: . . . [¶] 1. A student of the school, unless currently under suspension; [¶] 2. A governing Board Member or district employee who is required to be on school grounds, or any authorized person who is on school grounds at the District's/school's request."

Administrative Procedure 7007 outlines the process for registration and reiterates the provisions of section 627.4, stating: "The principal or designee may refuse to register any visitor if he/she reasonably concludes that the visitor's presence or acts would disrupt the school, students, or employees; would result in damage to property; or would result in the distribution or use of a controlled substance. The principal or designee or school security officer may revoke a visitor's registration if he/she was a reasonable basis for concluding that the visitor's presence on school grounds would interfere or is interfering with the peaceful conduct of school activities or would disrupt or is disrupting the school, students or staff."

The policy concludes: "Any person who is denied registration or whose registration is revoked may appeal to the Superintendent or designee by submitting within five (5) days a district complaint form and by following the District's complaint procedure (Administrative Policy 7216). The final segment in the appeal process is for the Board of Trustees to consider the appeal."

Administrative Policy 7216 specifies that if a complainant is not satisfied with the superintendent's decision, the matter may be appealed to the board of trustees, which may decide to hear or not to hear the complaint.

II

*Access to School Premises and Registration Requirement*

 Plaintiffs assert that because they sought to come onto the Rocklin High School campus for the legitimate purpose of distributing literature, school officials were required to give them permission to register to be on campus. We disagree.

Plaintiffs emphasize the Legislature's express intent that the school access statutes not be interpreted as contravening constitutionally protected rights. They point particularly to section 627, subdivision (c), which notes, in part: "It is also the intent of the Legislature that the provisions of this chapter shall not be construed to infringe upon the legitimate exercise of constitutionally protected rights of freedom of speech and expression which may be expressed through rallies, demonstrations, and other forms of expression which may be appropriately engaged in by students *and nonstudents* in a campus setting." (Italics added.)

This reference to nonstudents, plaintiffs argue, means that they have the right to register for the purposes of distributing literature on campus.

The statutes do not lend themselves to such an interpretation. That a restriction on access to a high school campus shall not be construed to infringe on the legitimate exercise of constitutional rights merely begs the question as to the scope of those constitutional rights. Nothing in any of these statutes authorizes unrestricted access to school grounds for outsiders seeking to disseminate information relating to societal issues of the day. While there may be times when nonstudents can "appropriately engage" in forms of expression "in a campus setting" (for example, when attending campus events to which the community has been invited), nothing in section 627 or related statutes suggests that school officials must permit outsiders to register and enter campus grounds. Indeed, as we discuss at greater length below, the entire statutory scheme, with its emphasis on school safety and the avoidance of disruption of the school, compels a contrary conclusion.

In support of their claims, plaintiffs cite three cases: *Braxton v. Municipal Court* (1973) 10 Cal.3d 138 [109 Cal.Rptr. 897, 514 P.2d 697] (*Braxton*), *People v. Hirst* (1973) 31 Cal.App.3d 75 [106 Cal.Rptr. 815] (*Hirst*), and *Mandel v. Municipal Court* (1969) 276 Cal.App.2d 649 [81 Cal.Rptr. 173] (*Mandel*). Each is readily distinguishable from the situation before us. *Braxton* construed another statute, section 626.4, which restricted access to a university, an institution which *Braxton* noted serves the "time honored role . . . as [a center] for free intellectual debate." (*Braxton, supra,* 10 Cal.3d at p. 149.) As we explain, the high school setting of the present case does not involve such a forum, and consequently the rules articulated in *Braxton* do not apply. Additionally, the statute at issue in *Braxton* was far broader than that implicated in the present case. Section 626.4 was held to apply not only to outsiders, but also to students and their own First Amendment rights, and therefore gave rise to concerns distinct from those we face here. (See *Braxton, supra,* 10 Cal.3d at pp. 144-151.) Indeed, the opinion in *Braxton* focused on the potential application of the statute to students. (*Id.* at pp. 144, fn. 2, 146-151.)

*Hirst* and *Mandel* narrowly construed a criminal proscription against loitering on school grounds, a statute that, again, covered any person and did not distinguish between students and outsiders. (See § 653g.) *Hirst* and *Mandel* also predate the federal cases that establish different parameters for public and nonpublic forums. Moreover, we note that *Hirst* is actually in line with the RUSD policies, as it concluded that "those who are not students and are not otherwise engaged in the normal operations of a school must be subject to such regulations governing a school and its property as the Legislature or the school administration may impose." (*Hirst, supra,* 31 Cal.App.3d at p. 84.) The court clarified that school authorities have the right "to forbid handbilling on school grounds by persons who are not students, teachers or administrators, or, if it be permitted, to control it as to time and place, or as to the character of the message, so long as discrimination does not result from the presentation of only one side of a possibly controversial subject." (*Ibid.*)

Finally, in recognition of the times in which we live, we note that all three of these cases were decided in a more innocent era, before school age children began to be singled out for violence by outsiders and before the need for school access laws became evident.

In claiming that outsiders must be given access to high school campuses for the purpose of distributing literature, plaintiffs fail to recognize that school campuses are not public forums.

■ As the United States Supreme Court has explained: "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." (*Perry Ed. Assn. v. Perry Local Ed. Assn.* (1983) 460 U.S. 37, 44 [103 S.Ct. 948, 954, 74 L.Ed.2d 794, 804] (*Perry*).) In public areas traditionally devoted to assembly and debate, i.e., in public forums, "the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest·and that it is narrowly drawn to achieve that end. [Citation.] The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. [Citations.]

"A second category consists of public property which the State has opened for use by the public as a place for expressive activity. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place.

[Citations.] Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest. [Citation.]

"Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.' [Citation.] In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. [Citation.] As we have stated on several occasions, ' " '[t]he State, no less than a private owner of property, has power to reserve the property under its control for the use to which it is lawfully dedicated.' " ' " (*Perry, supra,* 460 U.S. at pp. 45-46 [103 S.Ct. at p. 955, 74 L.Ed.2d at pp. 804-805].)

The Supreme Court has emphasized the unique nature of public forums. "[W]e noted that a traditional public forum is property that has as 'a principal purpose . . . the free exchange of ideas.' [Citation.] Moreover, consistent with the notion that the government—like other property owners—'has power to preserve the property under its control for the use to which it is lawfully dedicated,' [citation] the government does not create a public forum by inaction. Nor is a public forum created 'whenever members of the public are permitted freely to visit a place owned or operated by the Government.' [Citation.] The decision to create a public forum must instead be made 'by intentionally opening a nontraditional forum for public discourse.' " (*International Soc. for Krishna Consciousness, Inc. v. Lee* (1992) 505 U.S. 672, 679-680 [112 S.Ct. 2701, 2706, 120 L.Ed.2d 541, 550-551]; see also *Cornelius v. NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788, 802-804 [105 S.Ct. 3439, 3448-3450, 87 L.Ed.2d 567, 579-581].)

▮▮▮ Given the well-established boundaries of this forum analysis, it is not surprising that courts have found schools to be nonpublic forums. For example, in *Grattan v. Board of School Com'rs of Baltimore City* (4th Cir. 1986) 805 F.2d 1160, the court rejected plaintiff's claim that a school parking lot is akin to a public sidewalk and is therefore a public forum. Instead, the court characterized the parking lot as a nonpublic forum because it was not a traditional place of public communication, and it upheld the school district's right to deny a union activist access to the lot. (*Id.* at pp. 1162-1163.) In *DiLoreto v. Board of Education* (1999) 74 Cal.App.4th 267

[87 Cal.Rptr.2d 791], the court characterized Downey High School as a nonpublic forum "as a matter of law," and concluded that the board of education retained the right " 'to regulate access and content.' " (*Id.* at p. 281.)

While we express no opinion on the question of whether a board of education can regulate content, we agree that public high schools are not public forums. Secondary schools have a "special nature and function." (*DiLoreto v. Downey Unified School Dist. Bd. Educ.* (9th Cir. 1999) 196 F.3d 958, 968.). In *Rodriguez v. Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707 [230 Cal.Rptr. 823], the court described school districts and their students as having a unique relationship due to the "compulsory character of school attendance, the expectation and reliance of parents and students on schools and staff for safe buildings and grounds, and the importance to society of the learning activity which is to take place in public schools." (*Id.* at p. 714.) The court therefore found that the district had an affirmative duty "to take all reasonable steps to protect its students." (*Id.* at p. 715.)

California's statutes and Constitution "clearly demonstrate that schools are special places in terms of public access. Given the constitutional direction that students have a right to be safe and the legislative findings that outsiders commit a disproportionate number of the crimes on school grounds, access to schools is limited. Those who visit during school hours must register and declare their identity and purpose. Those who are asked to leave, whether or not required to register, must do so or else be guilty of a misdemeanor. Those who repeatedly return to cause disruption are also guilty of a misdemeanor." (*In re Joseph F.* (2000) 85 Cal.App.4th 975, 984 [102 Cal.Rptr.2d 641].) While registration "would not be justified on a public street, [it] is quite reasonable given the constitutional 'inalienable right [of students] to attend campuses which are safe, secure and peaceful' (Cal. Const., art. I, § 28, subd. (c)), and the legislative finding that 'a disproportionate share' of crimes on campuses are committed by outsiders (§ 627, subd. (c)). Indeed, such registration both allows for the administrative control of school grounds and serves as a deterrent to those who would otherwise enter the school grounds with criminal design." (*In re Joseph, supra*, at p. 987.) This statutory scheme vests in school officials the authority to monitor access to campuses and determine whether an outsider is likely to commit a disruption. (*Id.* at pp. 984-985.) And, as noted earlier, the same concerns are evident in other statutory provisions protecting against disruptions on public school campuses. (E.g., § 626.7; Ed. Code, § 32211.)

In short, plaintiffs' assumption that schools are public forums is without merit. Rocklin High School is a nonpublic forum and, consequently, restricting access to its campus may, in proper circumstances, be appropriate.

██ "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves." (*Perry, supra,* 460 U.S. at p. 49 [103 S.Ct. at p. 957, 74 L.Ed.2d at p. 807].)

██ Under section 627.4 and RUSD procedures, the school principal can refuse to permit an outsider to register "if he or she has a reasonable basis for concluding that the outsider's presence or acts would disrupt the school, its students, its teachers, or its employees; would result in damage to property; or would result in the distribution or use of unlawful or controlled substances." (§ 627.4, subd. (a).)

Again relying on *Braxton, supra,* 10 Cal.3d at page 153, plaintiffs assert that "disruption" must be defined as an act causing physical disruption by the commission of an unlawful act. But, as we have already pointed out, *Braxton* presented different concerns. It involved a different statute—section 626.4—which applies to both students and nonstudents and thus gives rise to different constitutional considerations because student conduct is at issue. And, as we noted earlier, the restrictions in that statute affected a college campus, not a high school. In that context, the California Supreme Court held that, to avoid constitutional problems of vagueness and overbreadth, "willful disruption" must be interpreted to apply only to incitements to violence or physically disruptive conduct otherwise proscribed by statute. (*Braxton, supra,* at pp. 144, 148, 150, 153.)

This case does not involve the same considerations. And in fact, the interpretation suggested by plaintiffs would make the school access laws ineffective. To require that outsiders be admitted to school campuses as long as their claimed purpose was not otherwise illegal would pose serious safety concerns. "Disruption" in the context of school access laws means disrupting the normal activities of the campus. The California Attorney General has commented: "School officials may deny access . . . if the [individual's] presence would interfere with the peaceful conduct of the activities of the school." (79 Ops.Cal.Atty.Gen. 58, 62 (1996).) "Under First Amendment principles, school administrators may reasonably regulate access to school grounds and impose conditions so as 'to preserve the property under [their] control for the use of which it is lawfully dedicated.'" (*Id.* at p. 64.)

And as one court noted in the context of a challenge to a school dress code: "[D]aily administration of public education is committed to school

officials and . . . such responsibility carries with it the inherent authority to prescribe and control conduct in the schools. The interest of the state in the maintenance of its education system is a compelling one and provokes a balancing of First Amendment rights with the state's efforts to preserve and protect its educational process. It is also well established that the First Amendment does not require school officials to wait until disruption actually occurs before they may act to curtail exercise of the right of free speech but that they have a duty to prevent the occurrence of disturbances." (*Jeglin v. San Jacinto Unified School Dist.* (C.D.Cal. 1993) 827 F.Supp. 1459, 1461.) "Because of the state's interest in education, the level of disturbance required to justify intervention is relatively lower in a school than it might be on a street corner and the Court may consider all circumstances confronting the school administrators which might reasonably portend disruption." (*Ibid.*)

Here, the statutes and the RUSD procedures place their focus exactly where it should be, on the maintenance of a peaceful, nonconfrontational environment for educational activities. The school administration acted reasonably in determining that SOHLNET's presence on campus would disrupt that atmosphere. In addition to interfering with traffic and students as they arrived on campus, SOHLNET's activities would require administrators and safety officers to interrupt their normal early morning campus duties to deal with these issues. (See *In re Oscar R.* (1984) 161 Cal.App.3d 770, 775 [207 Cal.Rptr. 789].) Moreover, the facts in this case revealed that SOHLNET's prior attempt to gain access to the campus had included videotaping students, which may well have intimidated them. The present effort delayed student attendance and ran the risk of confrontations with students.

■ "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation. . . . Nor is there a requirement that the restriction be narrowly tailored or that the Government's interest be compelling. The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message. [Citation.] Rarely will a nonpublic forum provide the only means of contact with a particular audience." (*Cornelius v. NAACP Legal Defense & Ed. Fund, supra,* 473 U.S. at pp. 808-809 [105 S.Ct. at p. 3452, 87 L.Ed.2d at p. 584].) ■ Here, plaintiffs in fact communicated with Rocklin High School students, simply by moving to a nearby public intersection.

We emphasize that the record does not suggest the school had created a limited public forum by allowing certain demonstrators to use the campus.

Nor is there any suggestion in the record that the school has discriminated between types of demonstrators. The only issue is whether the school is obligated to let outsiders unaffiliated with the school pass out literature on school property.

Denying registration did not violate plaintiffs' constitutional rights, and the trial court properly denied plaintiffs' request for declaratory and injunctive relief.

III*

. . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed. Respondents are awarded costs on appeal.

Davis, Acting P. J., and Kolkey, J., concurred.

---

*See footnote, *ante,* page 652.