STATE of Iowa, Appellee,

v.

Leonard N. WILLIAMS, Appellant.

No. 56140.

Supreme Court of Iowa.

Jan. 21, 1976.

Patrick C. McCormick, Sioux City, for appellant.

Richard C. Turner, Atty. Gen., Nancy J. Shimanek, Asst. Atty. Gen., and David J. Dutton, County Atty., for appellee.

REYNOLDSON, Justice.

This appeal concerns the interpretation and constitutionality of the Iowa criminal trespass legislation, chapter 274, Acts of the Sixty-fourth General Assembly (1971), now chapter 729, The Code, 1975.

Defendant pled not guilty to an information filed in Waterloo Municipal Court charging him with criminal trespass upon Waterloo school district property which resulted in damages exceeding $100. See § 729.3, The Code. Following his motion for change of venue, trial was held in Cedar Rapids Municipal Court. The jury returned a guilty verdict. Defendant was sentenced to four months' imprisonment, suspended upon one year's good behavior, and fined $100 payable in 30 days. He has appealed from this judgment. We affirm.

Our careful study of the transcript and record discloses substantial evidence from which the jury could have found the following facts.

At all times pertinent here the student body at West Junior High in Waterloo included over 1000 white and about 45 black students. An elderly speech teacher there distributed a story, "Little Brown Koko" to some speech class members as supplementary material to be used for oral work within the class.

The use of this story first came to the attention of the administrators at West Junior High on May 22 or May 23, 1972. In a classic understatement, it was described by the Waterloo superintendent as "inappropriate material to be used in schools today in Waterloo or any place else." A black school administrator (home-school community relations director) met with the teacher and parents of the children involved. The objectionable material was removed. An apology was made to the parents.

When the incident came to defendant's attention he, accompanied by parents of school children, visited the speech teacher's classroom on May 24. Defendant testified he wanted her fired and "we insisted on whatever was going to be done that it be done in writing from the superintendent's office." Although class was in session, defendant and those accompanying him remained there until they received a letter from the superintendent's office notifying them the teacher had been suspended for the remainder of the school year.

The following day, May 25, a number of white students, objecting to the teacher's dismissal, staged a sit-down in the school halls. The principal's attempt to talk out the problem in the school auditorium was unsuccessful. At approximately 10:00 A.M. school was dismissed for the day.

Defendant and several concerned parents had gone to West Junior High that morning. They eventually proceeded to the principal's office to discuss the safety of black students and to secure transportation for them to the "east side". Defendant testified the school superintendent responded there were 1100 white students running the streets whom he "had to see about." Nonetheless, a school bus arrived and transported the black students to an apparently pre-arranged destination, the "community enabler's office" on the east side of Waterloo.

In the afternoon defendant and others met at a city park. According to defendant, it was decided the group would "go and visit him [the superintendent] at his office for the conference that we did not have that morning." Defendant testified there were three reasons for taking this action: 1) parents' concern for the safety of their children and the materials being taught, 2) defendant's feeling his own children needed the protection of the superintendent, and 3)

the constitutional right to "carry their grievances to the seat of the government."

Defendant led 50 or 60 persons to the school administration building and into the superintendent's office. The secretary testified they ignored her request to sit in a large adjoining board meeting room. Defendant presented to the superintendent a written demand that the speech teacher be fired, the principal be fired, and a program of human relations be instituted. Defendant told the superintendent he should "initiate the follow-through." The defendant and his companions packed themselves into the small offices of the secretary and superintendent, filling every available space.

After a while the superintendent started to leave to attend a school board meeting he had called to study the demands, "at which time I was told that I should stay in my office by the defendant until such time as this could be initiated from within my office." The door was blocked by defendant's companions. Defendant and others were a human carpet on the floor. Defendant testified he told the superintendent, "Don't step on the brothers or the sisters." The superintendent's telephone was placed in a wastebasket and one of the demonstrators sat on it. The secretary's telephone was taken from her desk and partially disassembled.

Waterloo police who came to the secretary's door were told by these occupants "You can't come in." The police requested the superintendent be allowed to come out and received the response, "You're not coming in and he's not coming out." The officers who had gotten the door partly open were then pushed out and the door was shut.

At about 6:00 P.M. an assistant county attorney, using a bullhorn, informed the insiders they had to vacate the premises and free the superintendent within 20 minutes or face criminal trespass charges. Defendant announced that anyone on parole or probation and anyone else who did not wish to be arrested should leave.

In the words of one police officer "there were wall-to-wall people" in the hallway outside the secretary's door. Apparently sensing a hazard there, police took over the adjoining board meeting room and attempted to force an interior door to the superintendent's office. Persons inside broke the legs off a coffee table and with defendant's help used this and other available furniture to barricade the door.

When the time limit expired the police unsuccessfully attempted to push the door open, then gained entrance to the offices by sawing through the door. By then the demonstrators had retreated through the secretary's door to the building's lobby.

The police and the county attorney proceeded to the lobby where the latter read a district court injunction. The demonstrators were given five minutes to clear the premises. After expiration of this period the remaining persons were peacefully escorted from the building. Defendant was taken to the police station and charged with criminal trespass.

The occupation of the school offices resulted in damage to the rooms and furniture. A lamp was chipped, a coffee table broken, draperies were torn down, furniture was overturned, typewriter ribbons unrolled, supplies scattered, and papers damaged and strewn about. The carpet needed cleaning. Repair and cleanup costs totaled several hundred dollars. In addition, the superintendent and his secretary accomplished no productive work during the sit-in.

I. Section 729.1 provides:

*"729.1 Criminal trespass.* Definitions:

1. The term 'property' shall include any land, dwelling, building, conveyance, vehicle, or other temporary or permanent structure whether publicly or privately owned.

2. The term 'trespass' shall mean one or more of the following acts.

a. Entering upon or in property without legal justification or without the im-

plied or actual permission of the owner, lessee, or person in lawful possession with the intent to commit a public offense or to use, remove therefrom, alter, damage, harass, or place thereon or therein anything animate or inanimate, without the implied or actual permission of the owner, lessee, or person in lawful possession.

b. Entering or remaining upon or in property without legal justification after being notified or requested to abstain from entering or to remove or vacate therefrom by the owner, lessee, or person in lawful possession, or the agent or employee of the owner, lessee, or person in lawful possession, or by any peace officer, magistrate, or public employee whose duty it is to supervise the use or maintenance of the property.

c. Entering upon or in property for the purpose or with the effect of unduly interfering with the lawful use of the property by others.

d. Being upon or in property and using, removing therefrom, altering, damaging, harassing, or placing thereon or therein anything animate or inanimate, without the implied or actual permission of the owner, lessee, or person in lawful possession."

Defendant contends 1) the phrase "without legal justification," and the words "harass", "harassing" and "unduly" are unconstitutionally vague; 2) §§ 729.1(2)(b) and 729.1(2)(c) are overbroad in that they may apply to activity protected by the First and Fourteenth Amendments to the United States Constitution.

 II. It is clear defendant's conduct was of a type subject to state regulation. The record demonstrates his activity would be prohibited under any construction of the statute. See *Broadrick v. Oklahoma,* 413 U.S. 601, 608, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830, 837–838 (1973).

 We flatly reject defendant's argument the exercise of his First Amendment rights was reasonable. The First Amend-

ment has never licensed destruction of property or imprisonment of public officials. See *Cox v. Louisiana,* 379 U.S. 536, 554–555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471, 484 (1965); *Hurley v. Hinckley,* 304 F.Supp. 704, 709–710 (D.Mass.1969), aff'd, *Doyle v. O'Brien,* 396 U.S. 277, 90 S.Ct. 603, 24 L.Ed.2d 469 (1970).

 Ordinarily one to whom a statute is constitutionally applied will not be allowed to attack the statute on the grounds it might be unconstitutionally applied to others. *United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524, 529 (1960). But traditional rules of standing are relaxed to permit a defendant whose conduct admittedly falls within a statute to challenge an enactment as overbroad because of the "danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *Dombrowski v. Pfister,* 380 U.S. 479, 486–487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22, 28–29 (1965), quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418 (1963). Under this exception to the traditional rule, we recognize defendant's standing to challenge the constitutionality of § 729.1, supra.

III. Our rules which act to support statutes under constitutional attack were summarized in *State v. Aldrich,* 231 N.W.2d 890, 894 (Iowa 1975) and *State v. Kueny,* 215 N.W.2d 215, 216–217 (Iowa 1974) and need not be repeated here.

 In determining whether Iowa's criminal trespass legislation is vague or overbroad we note the principle that if a statute "can be made constitutionally definite by a reasonable construction, * * * this Court is under a duty to give the statute that construction." *United States v. Harriss,* 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989, 996–997 (1954); *State v. Lavin,* 204 N.W.2d 844, 849 (Iowa 1973); *State v. Ramos,* 260 Iowa 590, 596, 149 N.W.2d 862, 865 (1967). We do not search for intolerable lengths to which the unconstrued stat-

ute might be extended; rather we confine the language and thereby give effect to its provisions. *Von Weidlein International, Inc. v. Young,* 16 Ore.App. 81, 96, 517 P.2d 295, 298 (1973). This principle is followed even where the statute, if literally applied, would succumb to constitutional attack on grounds of vagueness and overbreadth. *Braxton v. Municipal Court,* 10 Cal.3d 138, 144, 514 P.2d 697, 700, 109 Cal.Rptr. 897, 900 (1973).

IV. Defendant first argues the words "harass" and "harassing" are unconstitutionally vague.

 A statute offends the Due Process Clause if it does not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. It meets the constitutional test if the meaning of the words used can be fairly ascertained by reference to similar statutes, other judicial determinations, reference to the common law, to the dictionary, or if the words themselves have a common and generally-accepted meaning. *State v. Aldrich,* supra at 894.

 In Webster's Third New International Dictionary, page 1031, "harass" is defined as "to lay waste;" "to worry and impede by repeated attacks;" "to tire out;" "to vex, trouble, or annoy continually or chronically." Each alternative involves some overt, intentional, persistent action. Unknowing harassment is precluded. It follows that the evils of a vague enactment do not inhere in the use of the word harass. In proscribing harassment, the statute regulates conduct; it does not encompass constitutionally protected speech or activity, as we have noted in division V. As so interpreted and limited, it does not encourage discriminatory enforcement, inhibit the exercise of First Amendment freedoms or serve as a trap for the innocent. See *Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222, 227–228 (1972).

The only decision we have found weighing the word "harass" on the void-for-vagueness scale is *State v. Sallinger,* 11 Ore.App. 592, 504 P.2d 1383 (1972). The Oregon court upheld that state's harassment statute in face of a similar constitutional attack.

Defendant relies on *Coates v. Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), in which the court found unconstitutional an ordinance making it a criminal offense for "three or more persons to assemble * * * and * * * conduct themselves in a manner annoying to persons passing by * * *." Because the state court had not restrictively construed the ordinance and it contained no guiding standards, the court found it vague and overbroad. 402 U.S. at 614, 91 S.Ct. at 1688, 29 L.Ed.2d at 217.

The *Coates* ordinance is not comparable to chapter 729, The Code. The word "harass" connotes some intentional, continued action, while the word "annoying" does not.

We think a person of ordinary intelligence would recognize a distinction between an intentional harassment in a chapter 729 context, and conduct on a public street which might inadvertently annoy passersby. It is the same distinction Mr. Justice Holmes analogously referred to when he said even a dog distinguishes between being stumbled over and being kicked. A person doing the stumbling or kicking has less trouble recognizing the difference. Even defendant, describing the deplorable conduct of white children at the school auditorium meeting in shouting at and throwing papers at the black children, readily concluded the latter were "being harassed."

It should also be noted the word "harass" does not stand alone in chapter 729 as did the term "annoying" in the *Coates* ordinance; "harass" takes its coloration from other terms in the enactment, *State v. Aldrich,* supra at 895, and thus acquires a more specific meaning because of its context.

Our conclusion has already been summarized in *CSC v. Letter Carriers,* 413 U.S.

548, 578–579, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796, 816 (1973):

"[T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest."

As above defined and limited, we hold the words "harass" and "harassing" are not unconstitutionally vague. The acts of defendant fell squarely within the plain meaning of those terms. We find no error here.

V. Defendant next asserts the phrase "without legal justification" is so vague it does nothing to limit the application of § 729.1(2)(a) or (b), The Code, supra.

■ We find persuasive here the court's rationale in *Hurley v. Hinckley,* supra, in which the words "without right" in a criminal trespass statute were challenged as vague and overbroad. The federal court held the words mean "without legal right," and legal right "includes any right of the plaintiffs, individually or collectively, found in the Constitution of the United States." 304 F.Supp. at 710. Thus the phrases "without right" and "without legal justification" expressly allow and protect entry on public property for the purpose of reasonably exercising First Amendment rights. See *Dunkel v. Elkins,* 325 F.Supp. 1235, 1241 (D.Md.1971), where the court, construing a statute which referred to persons who have "no lawful business to pursue," held that "lawful business" is any activity constitutionally protected.

■ Defendant relies on *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), where the court struck down as unconstitutional a statute which prohibited, without a just cause or legal excuse, loitering about a place of business with the intent to influence or induce others not to deal with that business. But *Thornhill* is distinguishable because that statute, on its face, prohibited constitutionally protected speech. Iowa's trespass enactment, in contrast, regulates conduct. The First and Fourteenth Amendments have never afforded the same kind of freedom to those who would communicate ideas by conduct as those who would communicate ideas by pure speech. *Cox v. Louisiana,* supra, 379 U.S. at 555, 85 S.Ct. at 464–465, 13 L.Ed.2d at 484. We are convinced our above construction of the language "without legal justification" is constitutionally acceptable in the specific context of a criminal trespass enactment.

VI. Defendant argues § 729.1(2)(c) is vague and overbroad because the word "unduly" has no ascertainable meaning and consequently no limiting effect on "interfering".

■ The word "undue" is defined in Black's Law Dictionary, page 1697, as "more than necessary; not proper; illegal." Webster's Third New International Dictionary, page 2492, defines "unduly" as "excessively". Thus under § 729.1(2)(c) one cannot unnecessarily, improperly, illegally or excessively interfere with the lawful use of property.

In *Cameron v. Johnson,* 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), a vagueness challenge was made to a statute prohibiting picketing or mass demonstrations which "obstruct or unreasonably interfere" with ingress and egress at a public premises. The court said:

"The terms 'obstruct' and 'unreasonably interfere' plainly require no 'guess[ing] at [their] meaning'. Appellants focus on the word 'unreasonably'. It is a widely used and well understood word and clearly so when juxtaposed with 'obstruct' and 'interfere.'"—390 U.S. at 616, 88 S.Ct. at 1338, 20 L.Ed. at 187.

■ We hold the words "unduly interfering", when so coupled, sufficiently apprise a person of common intelligence of the proscribed conduct.

■ Nor is the statute overly broad in this respect, as the State may legitimately regulate conduct which unduly interferes with lawful use of property. Squarely on point, the Supreme Court has said "the exercise of First Amendment rights may be regulated where such exercise will *unduly interfere* with the normal use of the public property by other members of the public with an equal right of access to it." (Emphasis supplied.) *Food Employees v. Logan Valley Plaza,* 391 U.S. 308, 320–321, 88 S.Ct. 1601, 1609, 20 L.Ed.2d 603, 613 (1968).

We hold the meaning of "unduly" as used here is clear and prevents an overly broad application of § 729.1(2)(c).

We thus find no merit in any of the propositions urged by defendant, and the judgment below is affirmed.

Affirmed.

MOORE, C. J., and LeGRAND, REES, UHLENHOPP and HARRIS, JJ., concur.

McCORMICK, MASON and RAWLINGS, JJ., dissent.

McCORMICK, Justice (dissenting).

I believe the words "harass" and "harassing" are unconstitutionally vague as employed in Code § 729.1.

As the majority opinion acknowledges, this defendant has standing to mount a facial attack upon the statute because it bears upon First Amendment rights. In determining the merits of this attack, we need not decide whether this defendant's actual conduct was prohibited. He is permitted to challenge the statute on its face not because his own right of free expression has been violated "but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830, 840 (1973). See *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 2568–2569, 45 L.Ed.2d 648, 660 (1975).

Thus the question is whether the statute on its face "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application * * *." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926). Criminal responsibility should not attach to anyone under a penal statute which does not give fair warning of what is prohibited and provide a normative standard for its enforcement. *Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222, 227–228 (1972).

The vagueness test can best be understood and applied in light of the evils it seeks to prevent:

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms'. Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" * * * than if the boundaries of the forbidden areas were clearly marked'." *Id.,* 408 U.S. at 108–109, 92 S.Ct. at 2298–2299, 33 L.Ed.2d at 227–228.

Even after the effort of the majority opinion to explain the meaning of the terms "harass" and "harassing" in § 729.1, I do not believe the statute can survive defendant's vagueness attack.

The statute is broadly drawn. It defines "property" as "any land, dwelling, building, conveyance, vehicle, or other temporary or permanent structure whether publicly or privately owned". § 729.1(1), The Code. It purports to put public places in the same category as private places in defining what constitutes a criminal trespass. The statute does not distinguish between the quality of one's right to enter or remain in a public place and one's right to enter or remain in a private place. However, this distinction is important when First Amendment rights are involved. When private property is not ordinarily open to the public, access to it for the purpose of exercising First Amendment rights may be denied altogether. When private property is dedicated to public use or public property is involved, access to it for the purpose of exercising First Amendment rights may not unreasonably be denied, although the exercise of First Amendment rights may be regulated so as to prevent interference with the public use to which the property is ordinarily put. *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972); *Food Employees v. Logan Valley Plaza*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). The vagueness challenge to the terms "harass" and "harassing" in § 729.1 raises First Amendment questions. The failure of the statute to recognize the distinction between exercise of First Amendment rights in public and private places contributes to the uncertainty created by its use of those terms.

Next, in defining a punishable "trespass", the statute creates four categories of what it describes as "acts". Only two of these categories, §§ 729.1(2)(a) and 729.1(2)(d), use the terms "harass" or "harassing". Insofar as pertinent here, the gist of an offense under § 729.1(2)(a) is entering upon or in property without legal justification, or without permission, with the intent to harass anything animate or inanimate thereon or therein, without permission. What is made punishable as a trespass is the entering of property in these circumstances with an intent to harass. The "intent to harass" is not an act but the mental element of the offense.

Under § 729.1(2)(d) the presence on the property involved is presumably lawful. Insofar as relevant here, that provision permits conviction for (1) "[b]eing upon or in property" and (2) "harassing * * * thereon or therein anything animate or inanimate", without permission. No act similar to a common-law trespass is required. *Cf. Mann v. Des Moines Ry. Co.*, 232 Iowa 1049, 1056, 7 N.W.2d 45, 50 (1942). What is made punishable as a trespass is "harassing" while lawfully present on the property involved. The offense consists entirely of "harassing" while there.

Interpretation of the word "harass" in the majority opinion falls far short of providing an ascertainable standard by which to determine what conduct the statute purports to proscribe in its use of the word. The majority's interpretation does not support its conclusory assertion that the term does not infringe First Amendment rights.

The majority opinion adopts a dictionary definition of harass. That definition, from Webster's Third New International Dictionary, p. 1031, includes several alternatives which are difficult to reconcile. Moreover, the majority contributes to the vagueness problem by the very multiplicity of approved alternative meanings. For example, one definition is "to lay waste". The dictionary adds parenthetically "(as an enemy's country) RAID, HARRY (hostile Indians [harassed] the frontier)". This definition suggests the term refers to physical damage inflicted upon inanimate property.

The next definition is "to worry and impede by repeated attacks". The dictionary adds as an illustration "(his guerilla forces cooperated with United States parachute troops in [harassing] the Japanese)". Al-

though this definition suggests the term refers to physical attacks upon animate beings, we are left to wonder whether the intent of such attacks may be limited to a mental or emotional reaction instead of physical damage.

Another definition is "to tire out". The dictionary adds "(as with physical or mental effort): EXHAUST, FATIGUE (I have been [harassed] with the toil of verse—William Wordsworth)." This meaning suggests harassment can consist of mere mental effort which results in fatigue. Apparently Wordsworth felt harassed by his own work. Here we are left to wonder whether a petty bureaucrat might not believe himself harassed any time a citizen's demand or request discomforts him.

Finally, the dictionary supplies "to vex, trouble, or annoy continually or chronically". It adds "(as with anxieties, burdens, or misfortune): PLAGUE, BEDEVIL, BADGER (sciatica occasionally [harassed] her— Arnold Bennett) ([Harass] the pilot and thus keep him in a constant state of * * upset—H. G. Armstrong) ([harassed] * * by lack of funds—Henry Miller) (begins to [harass] her with questions—Donald Heiney) syn. see WORRY." In this meaning the word sweeps in communicative as well as ordinary conduct, and the resulting vexation, trouble, or annoyance is mental or emotional, not physical. This definition does not impose any limits on the communications or acts which are sufficient to vex, trouble or annoy. A provision like § 729.-1(2)(d) which permits prosecution for "harassing" another while lawfully present in a public place is thus a sword in the hands of any official or other person who deems himself "vexed", "troubled", "annoyed", or "worried" by the conduct of a citizen.

As defined in the majority opinion, the words harass and harassing have several alternative and inconsistent meanings. The majority assures us no vagueness problem exists because a common thread joins these definitions: "Each alternative involves some overt, intentional, persistent action," so that "Unknowing harassment is preclud-

ed." This is no answer to the problem. At most, the opinion tells us something about what harassment is not; it does not tell us what it is. Saying there is no problem because what is done which is punishable must be done on purpose fails utterly to identify what it is that should not be done. Neither the statute nor the majority opinion tells us what "overt, intentional, persistent action" is punishable. Men of common intelligence must still guess at the statute's meaning and differ as to its application.

All of the evils of vague statutes noted in *Grayned v. City of Rockford*, supra, attend the use of the words harass and harassing in § 729.1.

No standard of conduct is specified. In this respect the statute as interpreted in the majority opinion is indistinguishable from the ordinance in *Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). The Cincinnati ordinance made it a criminal offense for three or more persons to assemble in certain public places and "conduct themselves in a manner annoying to persons passing by". In an effort to save the ordinance, the Ohio Supreme Court adopted a dictionary definition of "annoy" as "to trouble, to vex, to impede, to incommode, to provoke, to harass or to irritate." 21 Ohio St.2d 66, 69, 255 N.E.2d 247, 249. Just as with the statute in the present case, neither the ordinance nor the state court's interpretation of it indicated upon whose sensitivity a violation would depend, whether it would be "the sensitivity of the judge or jury, the sensitivity of the arresting officer, or the sensitivity of a hypothetical reasonable man". This problem did not involve a distinction between intentional and inadvertent conduct, nor did it involve mere imprecision in providing a standard. As with the statute in the present case, the ordinance provided no standard at all:

"Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative

standard, but rather in the sense that no standard of conduct is specified at all. As a result, 'men of common intelligence must necessarily guess at its meaning'." *Coates v. Cincinnati,* supra, 402 U.S. at 614, 91 S.Ct. at 1688, 29 L.Ed.2d at 217.

The Supreme Court in *Coates* did not base its decision upon the fact that annoyance could be inadvertent. The asserted significance of this factor surfaces for the first time in the majority opinion in the present case.

Besides the fact this distinction fails to meet the actual basis of the decision in *Coates,* it is fallacious. The same authority relied upon by the majority in defining "harass", Webster's Third New International Dictionary, also defines "annoy", at page 87. That definition includes:

"to irritate with a nettling or exasperating effect esp. by being a continuous or repeatedly renewed source of vexation. PROVOKE, VEX * * *.

"to harass esp. by quick and brief attacks (dogs [annoying] a cornered bear) (infiltrating behind the lines so as to [annoy] the enemy replacement) syn. VEX, IRK, BOTHER, WORRY"

In light of these meanings, it is difficult to see how annoyance would rest any more or any less upon "some overt, intentional action" than harassment.

Nor should the majority take comfort from the opinion of the Oregon Court of Appeals in *State v. Sallinger,* 11 Or.App. 592, 504 P.2d 1383 (1972). That case dealt with a challenge to an Oregon statute defining a crime of "harassment". Insofar as relevant here, the statute said a person was guilty of harassment "if, with intent to harass, annoy or alarm another person, he * * * subjects another to offensive physical contact". The court held the "intent to harass, annoy, or alarm" constituted the mental element of a crime which was complete only with physical contact "substantially the same as a strike, shove or kick". 11 Or.App. at 599, 504 P.2d at 1386.

In this context the Oregon statute specifically articulated the conduct which was proscribed. It provided an objective standard. The statute itself was a purported definition of harassment; it did not leave one wondering what conduct was outlawed.

The majority opinion's summary conclusion that § 729.1's use of "harass" and "harassing" does not inhibit First Amendment freedoms is also unjustified. This conclusion depends wholly upon the premise that the First and Fourteenth Amendments do not afford the same kind of freedom to those who communicate ideas by conduct as to those who communicate ideas by pure speech. Although this premise is accurate so far as it goes, it does not support the conclusion. Nonviolent conduct employed as symbolic speech is protected First Amendment activity. *Tinker v. Des Moines Community School Dist.,* 393 U.S. 503, 508–509, 89 S.Ct. 733, 737–738, 21 L.Ed.2d 731, 739 (1969); *State v. Kool,* 212 N.W.2d 518 (Iowa 1973). Public places provide a traditional forum for activities protected by the First Amendment. Citizens are constitutionally assured rights not only of free speech but of free assembly and to petition for redress of grievances. These rights are subject only to reasonable regulations which may be imposed to prevent interference with the public use to which the property is dedicated. See *Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). As these cases make clear, regulation by vague statutes or ordinances infringes the protected First Amendment rights. Regulations must be carefully, precisely, and narrowly drawn so they do not sweep in constitutionally protected activities. They must give fair notice of what is prohibited. When citizens exercise First Amendment rights in public places in a manner which does not interfere with the use to which the property is ordinarily put, they may not be punished simply because their conduct is provocative, vex-

ing, annoying, worrying, discomforting, irritating, tiring, exhausting, badgering, bedevilling, harrying, or upsetting to someone else. Because of the uncertainty about just what "overt intentional action" is proscribed, the majority's limitation of prosecutions based upon "intent to harass" or "harassing" does not obviate the chilling effect § 729.1 inevitably has upon the exercise of First Amendment freedoms. The words are too vague to give notice of the conduct prohibited.

In its use of those vague terms, the statute strikes at the heart of a citizen's right of free speech, right of assembly, and right to carry a grievance to the seat of government, assured by the First Amendment. This situation is like that in *Terminiello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). There the Illinois Supreme Court had sustained the constitutionality of a Chicago breach of the peace ordinance which permitted conviction upon proof of speech which "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance". In reversing the case, the United States Supreme Court said:

"The vitality of civil and political institutions in our society depends on free discussion. As Chief Justice Hughes wrote in *De Jonge v. Oregon*, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278 [284], it is only through free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is effected. The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes.

"Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, *Chaplinsky v. New Hampshire*, supra (315 U.S. pp. [568] 571, 572, 62 S.Ct. 766, 86 L.Ed. [1031], 1034, 1035), is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." 337 U.S. at 4, 69 S.Ct. at 895–896, 93 L.Ed. at 1134.

Statutes and ordinances which regulate conduct must not permit punishment of the fair exercise of First Amendment rights. *Brown v. Louisiana, Cox v. Louisiana, Edwards v. South Carolina*, supra.

I would sustain defendant's facial vagueness attack on § 729.1 based upon use of the word "harass" in § 729.1(2)(a) and the word "harassing" in § 729.1(2)(d). The effect would be to excise those words from the statute. *State v. Aldrich*, 231 N.W.2d 890, 895–896 (Iowa 1975), and citations. The result would be a viable statute.

Since the trial court erred in permitting the jury to find defendant guilty on the basis of the statute as it presently reads, I would reverse and remand for new trial under the statute with the words "harass" and "harassing" omitted.

MASON and RAWLINGS, JJ., join in this dissent.